## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VICENTE SALCEDO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SUBARU OF AMERICA, INC., a New Jersey Corporation, and SUBARU CORPORATION, a Japanese Corporation,<br><br>Defendants. | No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Vicente Salcedo brings this action against Defendants Subaru of America, Inc. and Subaru Corporation (collectively, "Subaru"), by and through his attorneys, individually and on behalf of all others similarly situated, and alleges as follows:

### I. INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiff on behalf of himself and a proposed class of past and present owners and lessees of model year 2013 and 2014 Subaru WRX and WRX STi vehicles (collectively, the "Class Vehicles").

- 1 -

2.     This action arises from Defendants' failure, despite their longstanding knowledge of a material defect, to disclose to Plaintiff and similarly situated consumers that the engines in the Class Vehicles contain, *inter alia*, defective rotating assemblies (including defective connecting rod bearings, defective connecting rod side clearances, and/or insufficient channels of engine lubrication) (herein, the "Rotating Assembly Defect").

3.     As explained in more detail below, when the connecting rod bearings begin to fail, metal debris is circulated throughout the engine via contaminated engine oil. This defect – which existed at the time each Class Vehicle was manufactured, and typically manifests itself during and shortly after the limited warranty period has expired – will inevitably cause the Class Vehicles to experience spun connecting rod bearings and catastrophic engine failure. Further, due to insufficient channels of oil lubrication, the Class Vehicles often experience accelerated and premature catastrophic engine failure that can result in stalling events while the vehicle is being operated.

4.     Significantly, the presence of this defect poses a safety risk to the operator and passengers of the Class Vehicles. The Rotating Assembly Defect can cause catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to

an increased risk of accident, injury, or death. As discussed further herein, numerous owners and lessees of the Class Vehicles have experienced engine damage and catastrophic engine failure while operating the Class Vehicles, thus placing themselves and those around them in immediate danger

5.    Not only did Subaru actively conceal that particular components within the Class Vehicles' engines are prone to failure, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns descried herein.

6.    Subaru's conduct in marketing and selling the Class Vehicles is in breach of its warranties and in violation of state law. Subaru has and will continue to benefit from its unlawful conduct—by selling more vehicles, at a higher price, and by avoiding its warranty obligations—while consumers are harmed at both the point of sale and as the engines in their vehicles begin to fail. Had Plaintiff and other proposed class members known about the latent defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

7.    Despite notice and knowledge of the defect from the numerous complaints it has received, information from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records, including pre-sale durability testing and quality policies, Subaru has not recalled

the Class Vehicles to repair the defect, offered its customers suitable repairs or replacements free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses to repair the defect.

8.     To remedy Subaru's unlawful conduct, Plaintiff, on behalf of himself and the proposed class members, seeks damages and restitution from Subaru including but not limited to reimbursement for all expenses already incurred because of the defective engines, including repairs, diagnostics, and incidental costs (*e.g.,* towing charges, vehicle rentals, etc.), as well as notification to class members about the latent catastrophic engine defect.

## II. JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members;[1] (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal

---

[1] http://www.thetruthaboutcars.com/2015/08/chart-day-subaru-sets-monthly-u-s-wrxsti-sales-record-july-2015/ (last visited October 6, 2017).

jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, Defendants have advertised in this district and have received substantial revenue and profits from selling and leasing the Class Vehicles in this district; therefore, a substantial part of the events and omissions giving rise to the claims occurred within this district.

11.    This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

## III. THE PARTIES

### A.    Plaintiff Salcedo

12.    Plaintiff Salcedo is a citizen of California, residing in Westminster, Orange County.

13.    In August 2015, Plaintiff Salcedo purchased a 2013 Subaru Impreza WRX from a private party located in Orange, California.

14.    Plaintiff Salcedo purchased his Subaru vehicle for personal, family, or household use. His vehicle bears Vehicle Identification Number JF1GR7E62DG868031 and is registered in California.

15.    In or around July 2017, at approximately 68,759 miles, Plaintiff was driving his vehicle on the highway when the engine suddenly began to exhibit a

"knocking" sound and then catastrophically failed. Thereafter, Plaintiff contacted Subaru of America for advice on repairing his vehicle. Subaru of America instructed Plaintiff to contact Subaru Orange Coast, an authorized Subaru dealer and repair center located in Santa Ana, California, and have the vehicle towed there for diagnosis and repair related to the sudden engine failure.

16.     Subaru Orange Coast charged Plaintiff Salcedo a $134 diagnostic fee to diagnose the issue that caused his sudden engine failure. The invoice reads: "Customer states engine is knocking – tow in check and advise," "multi point inspection," and "perform tire pressure service."

17.      Upon further inspection, Subaru Orange Coast indicated on Plaintiff's August 21, 2017 repair invoice that, "engine need[ed] to be remove[d] and [torn] down to inspect damage. Found connecting rod #1 damage sending metal shaving to cylinder walls caus[ing] damage to short block. Short block and all relating parts need to be replace[d]."

18.     Plaintiff inquired if the repairs would be covered by Subaru's warranty but was informed that any repairs would not be covered and Plaintiff would be required to pay out-of-pocket for any repairs.

19.     Plaintiff was quoted approximately $5,711.15 by Subaru Orange Coast for the necessary repairs.

20.     Subaru Orange Coast contacted Subaru of America on Plaintiff's

behalf. Subaru of America then called Plaintiff and informed him that Subaru of America would cover $2,000 of the repair cost as a goodwill gesture. Plaintiff inquired if Subaru of America could assist by paying for more of the substantial repair cost, but Subaru of America declined to do so.

21.     On or about August 21, 2017, Plaintiff picked up his repaired vehicle from Subaru Orange Coast and paid $3,711.15 in out-of-pocket costs for parts and labor related to catastrophic engine failure in his vehicle.

22.     Plaintiff would not have purchased this vehicle, or would have paid substantially less for it, had the engine defect been publicly disclosed by Subaru prior to the time of purchase.

**B.      Defendants**

23.     Defendant Subaru Corporation, formerly known as Fuji Heavy Industries Ltd.,[2] is a Japanese corporation located at Ebisu Subaru Building, 1-20-8, Ebisu, Shibuya-ku, Tokyo 150-8554. Subaru Corporation is responsible for the design, manufacturing, distribution, marketing, sales, and service of Subaru vehicles, including the Class Vehicles, around the world, including in the United States.

24.     Defendant Subaru of America, Inc. ("SOA") is a New Jersey

---

[2] Fuji Heavy Industries Ltd. changed its name to Subaru Corporation, effective April 1, 2017. https://www.subaru.co.jp/en/ (last accessed Sept. 7, 2017).

corporation with its principal place of business located in Cherry Hill, New Jersey. SOA is the wholly-owned U.S. sales and marketing subsidiary of Subaru Corporation, and it distributes, markets, sells, and services Subaru vehicles in the United States.

25.     Subaru Corporation and SOA have common leadership: SOA's sales, marketing, and distribution efforts are headed by corporate officers of Subaru Corporation. For example, Tomomi Nakamura, Corporate Executive Vice President for Subaru Corporation, is also the chairman and CEO of SOA.[3]

26.     Subaru Corporation and SOA communicate with one another concerning virtually all aspects of the Subaru vehicles sold and leased within the United States, including development of owner's manuals, warranty booklets, and maintenance recommendations and schedules for the Class Vehicles.

## IV. <u>NEW JERSEY LAW APPLIES</u>

27.     It is appropriate to apply New Jersey law to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state.

28.     New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution. New

---

[3] http://www.subaru.com/camden.html (last visited Oct. 4, 2017); https://www.subaru.co.jp/en/outline/profile.html (last visited Oct. 4, 2017).

Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

29.     As discussed above, Defendant Subaru of America, Inc. is headquartered in Cherry Hill, New Jersey and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting Subaru vehicles.

30.     Defendants own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

31.     Upon information and belief, Subaru's customer relations, technical training center, engineering, marketing, and warranty departments are all located in SOA's Cherry Hill, New Jersey campus. SOA's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to Subaru or third-party websites. SOA's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from Subaru's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.

32.     Specifically, according to its website, SOA occupies an $18 million, 115,000 square-foot, seven-story structure in Cherry Hill, New Jersey where it serves as the company's national headquarters housing approximately 300 people in Finance, IT, Marketing, Sales and Product Planning.[4] Furthermore, Subaru has an Operations Center located in a 59,000 square-foot building in Pennsauken, New Jersey housing nearly 200 employees from Customer Loyalty, Government Relations, Parts, Service, Training, Customer Retailer Service and Subaru Financial Services.[5]

33.     Based on the foregoing, such policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, SOA's headquarters in Cherry Hill, New Jersey. As detailed below, Subaru also came to know, or should have come to know, of the Rotating Assembly Defect through the activities of Subaru's divisions and affiliated entities located within New Jersey. Accordingly, the State of New Jersey has the most significant relationship to this litigation and its law should govern.

## V. TOLLING OF STATUTES OF LIMITATION

34.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff

---

[4]*See* http://www.subaru.com/company.html (last visited Sept. 6, 2017).
[5] *Id.*

and proposed class members could not have reasonably discovered the true, latent defective nature of the proposed Class Vehicles until shortly before this litigation commenced.

35.    In addition, even after Plaintiff and Class Members contacted Defendants and/or their authorized dealers for vehicle repairs concerning the Rotating Assembly Defect, they were routinely told by Defendant and/or through its dealers that the Class Vehicles were not defective.

36.    Defendants were and remain under a continuing duty to disclose to Plaintiff and the members of the Class the true character, quality and nature of the Class Vehicles, *i.e.* that the Class Vehicle engines are defective and will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

# VI. <u>FACTUAL ALLEGATIONS</u>

**A. The Rotating Assembly Defect within the Class Vehicles.**

37.     The Subaru Impreza is a compact family car that was first manufactured in 1992 and is now in its fifth generation of manufacturing.

38.     Subaru also manufactures a "WRX" (short for world rally) version of the Impreza which features increased performance over the standard Impreza.

39.     Subaru has and continues to market the WRX models as high-performance vehicles. For example, Subaru currently states "*There's never a dull moment behind the wheel of the WRX and WRX STI. Forged in rally competition, tempered on the racetrack, they're built to inspire with control, and excite—any day, any season, any road.*" [6]

40.     The 2013-2014 Subaru Impreza WRX and WRX Sti models at issue in this litigation were manufactured with Subaru's EJ "short block" engine. The EJ is a four-stroke combustion engine manufactured by Subaru. The EJ is a dual overhead camshaft 16-valve turbo engine.

41.     EJ "short block" engines are sub-assemblies comprising the portion of the cylinder block below the head gasket but above the oil pan.

---

[6]
https://www.subaru.com/guides/wrx/my18/Intro/WRX?utm_source=com&utm_medium=view-button&utm_term=WRX&utm_campaign=RAB&utm_content=MY18 (last visited October 10, 2017).

42.     As background, the EJ Engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of Combustion Cycle is below:



43.     The pistons are connected to the crankshaft via the connecting rod. As the connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately resulting in power to the drive wheels of the vehicle. During this cycle, the crankshaft rotates many thousands of times per minute within each connecting rod. In order to reduce friction and prolong longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces. As a result, the connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle. An exemplar diagram of the piston, connecting rod, connecting rod bearing and crankshaft are shown below:





Figure 3-70.—Connecting rod bearings.

44.     When the Class Vehicles are in operation, engine oil is used to lubricate the piston, cylinder wall, connecting rod bearings and other rotating and moving components as the piston moves up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the engine oil filter. Oil is pumped and pressurized throughout the engine by the oil pump. The oil pump draws oil from the oil pan, located underneath the piston and crankshaft. The oil pump forces engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction in internal moving engine components. The oil then returns to the oil pan through small drainage holes located throughout the engine where it will be recirculated by the oil pump. Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:



45. The connecting rod bearings are also lubricated with engine oil in order to allow the crankshaft to rotate within the connecting rods. A close up picture of a functional connecting rod bearing is below:



46.     The defect inherent in the Class Vehicles causes an insufficient supply of engine oil to coat the bearing surfaces, compromising the integrity of the oil barrier between the bearings and the corresponding metal parts they are designed to protect. When the Rotating Assembly Defect manifests, it results in excessive and frequent contact between the connecting rods and connecting rod bearings. This contact causes accelerated wear on the connecting rod bearing surfaces in the Class Vehicles, ultimately causing them to disintegrate and fracture.

47.     As the connecting rod bearings begin to fracture, large amounts of metal debris begin to accumulate in the engine oil. As a result, the oil becomes so contaminated that the oil filter can no longer remove the plethora of metal debris

from the oiling system. This contaminated engine oil is re-circulated throughout the engine by the oil pumps, causing damage to the various engine components and eventually leading to catastrophic engine failure.

48.    Additionally, as the connecting rod bearings continue to fracture, the acceptable tolerances between the connecting rod bearings, the connecting rods, and the crankshaft begin to rapidly deteriorate. Eventually, the Class Vehicles begin producing a "knocking" or "rattling" sound originating from the engine as a result of the deteriorating connecting rod bearings. Additionally, the defective connecting rod bearings may eventually cause the piston to break through the engine block due to such deterioration. This space is referred to in the automobile industry as "play."

49.    The defective engines can fail during operation, so that vehicles suddenly stall and shut down even when traveling at high speeds, risking the lives of drivers, their passengers, and others on the road.

50.    Defendants knew or should have known about the defect and its consequences since at least 2009, four years before the Class Vehicles were manufactured.

51.    Subaru is experienced in the design and manufacture of consumer vehicles. Subaru conducts extensive pre-release testing on batches of components, including the short block engines, to verify the parts are free from defects and

comply with Subaru's specifications.[7] Given the speed and frequency with which the defect typically becomes apparent, it is not plausible that Subaru's preproduction testing would not have alerted Subaru to the existence of the defect. Only Subaru, however, has access to its prerelease testing data.

52.     Subaru also receives data about how its vehicles are performing in the days, weeks, and months after they are sold. Subaru collects information from both drivers and dealerships, including through complaints, warranty claims, repair and replacement parts data, and other aggregated data sources. Subaru has exclusive access to this information too.

53.     Defendants' Quality Assurance Group interacts with Subaru-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues. Subaru's Quality Assurance Group also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by

---

[7] In fact, Subaru Corporation's philosophy consists of three tenets, including: "We will strive to create advanced technology on an ongoing basis and provide consumers with distinctive products with the highest level of quality and customer satisfaction." https://www.subaru.co.jp/en/csr/pdf/governance_guideline_e.pdf (last visited Oct. 4, 2017) (attached hereto as **Exhibit 1**). Its Quality Policy, established in 1994, provides that "Subaru considers customer satisfaction as the first priority, and will work constantly to improve products and services to provide world-class quality." https://www.subaru.co.jp/en/outline/vision.html (last visited Oct. 4, 2017).

engineers who have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

54.     Defendants' National Warranty Department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because they will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

55.     Defendants were also aware of the high number of replacement parts ordered due to the engine defect. All Subaru service centers are required to order replacement parts directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. Defendants routinely monitor part sales reports, and Subaru has designated internal teams that are responsible for actually shipping parts requested by dealerships and technicians. Thus, Defendants have detailed, accurate, and real-

time data regarding the number and frequency of replacement part orders. The

sudden increase in orders for short block engines and engine components used in

the Class Vehicles was known to Defendants, and should have alerted them to the

scope and severity of the defect.

56.    In addition, since November of 1994, Subaru's internal quality

management system has been in place to "to impress customers through the

establishment of quality policy in line with our customer first policy and a high

level of integration of safety, enjoyment and environmental performance."[8]

57.    Specifically, Subaru's Product Quality Management System identifies

four key metrics that Subaru has instituted:

- Establish Quality Management System (QMS) based on the Quality Policy and ISO 9001 Standard and put it into practice for orderly and effective operations.
- Clarify the quality targets acceptable to customers at the planning stage.
- Realize the quality targets through quality assurance activities at each stage from development to sales and service.
- Attend to complaints and requests from the market quickly and appropriately to live up to the trust of customers.

58.    Using this system, Subaru "works to assure quality in each process

from design and development through to sales as well as creating a cycle to create

---

[8] https://www.subaru.co.jp/en//csr/consumers/pdf/quality.pdf (last visited Oct. 4, 2017) (attached hereto as **Exhibit 2**). The remaining citations in this section all refer to information found on this webpage.

even higher quality products. In addition, FHI strives to work through this cycle swiftly in order to meet customer needs without any delay."

59.    Subaru's quality management cycle consists of three stages. In the design and development stage, consideration is "given to preventing variability and standardization of tasks from the blueprint creation stage through to production processes."

60.    The production stage entails "establishment of process management *aimed at preventing quality defects and variability as well as implementation of strict quality inspection and testing*."

61.    The distribution and sales stage begins after vehicles are shipped and collects after-sales information and quality improvements that can be made. Subaru explicitly collects and analyzes "information on quality defects and requests sent to dealerships and SUBARU Customer Center."

62.    Subaru then takes the quality defect data and "prompt[ly]" implements in successive design and development stages.

63.    Finally, "[i]n the event of product defects, not only do we [Subaru] respond properly based on the laws and regulations of each country, but we also determine the specific details of our response by promptly establishing a

committee structure for staff from departments involved in quality, including those outside of Japan, to investigate."

**B. Complaints by Other Class Members.**

64.     Subaru monitors drivers' safety-related reports to the National Highway Transportation Safety Administration ("NHTSA"), which can be viewed on NHTSA's website. Dating back to at least April of 2009, drivers of Subaru vehicles with EJ model engines began contacting the NHTSA to complain about their vehicles experiencing similar engine defects relating to the connecting rod bearings.

65.     Subaru's Customer Relations departments routinely monitor the internet for customer complaints and have retained the services of third-parties to do the same. Further, the Customer Relations division regularly receives and responds to driver calls concerning vehicle problems.

66.     Many owners and lessees of the Class Vehicles have publicly complained online, or to the Office of Defects Investigation (ODI) within the NHTSA. ODI conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the nation's highways. The

following are just a few examples of the complaints submitted to ODI concerning

Class Vehicles and earlier Subaru vehicles with similar EJ engines:

**Date Complaint Filed**: 04/30/2009
**Date of Incident**: 04/02/2009
**Component(s)**: ENGINE AND ENGINE COOLING
**NHTSA ID Number**: 10267401
**Consumer Location**: BURKE, VA
**SUMMARY**:
MY 2009 SUBARU IMPREZA WRX, WHICH I USE AS A DAILY DRIVER,
HAD A MAJOR ENGINE BREAKDOWN AT ABOUT 9000 MILES
CONSISTING OF A LOUD KNOCKING SOUND AND EXTREME ENGINE
VIBRATION. THE SYMPTOMS WERE CONFIRMED BY MY DEALER AS A
SPUN ROTATING ASSEMBLY(#4). MY ENGINE AND TURBOCHARGER
WERE REPLACED UNDER WARRANTY (AFTER A 24 DAY WAIT).
SCHEDULED MAINTENANCE HAD BEEN DONE PRIOR TO THE FAILURE
(OIL CHANGES). WHILE THE FAILURE DID NOT CAUSE AN IMMEDIATE
SAFETY SITUATION, AS I WAS VERY CLOSE TO HOME AT THE TIME, I
FEEL THAT AN ISSUE LIKE THIS COULD PRESENT AN UNSAFE
SITUATION WERE IT TO HAPPEN ON THE MANY LONG ROAD TRIPS
THAT I TAKE, OFTEN IN UNPOPULATED OR RURAL AREAS. I ALSO
DRIVE IN THE LOCAL MOUNTAINS QUITE A BIT IN WINTER TO GO
SKIING AND A BREAKDOWN IN THE MIDDLE OF NOWHERE IN
FREEZING WEATHER WOULD NOT HAVE BEEN SAFE. MY RESEARCH
(AND DEALER STATEMENTS) INDICATE THAT THIS IS A PROBLEM
THAT A LARGE NUMBER OF WRX'S BUILT IN THE FIRST THREE
MONTHS OF PRODUCTION ARE EXPERIENCING. SUBARU OF AMERICA
HAS OFFERED NO EXPLANATION ABOUT WHY THIS HAPPENED OR
WHY IT IS HAPPENING TO MANY OTHERS WHO OWN THIS CAR.
ALTHOUGH I HAVE A REPLACEMENT ENGINE, I HAVE RECEIVED
ABSOLUTELY NO ASSURANCES THAT IT WILL NOT HAPPEN AGAIN
AND (FRANKLY) HAVE LITTLE CONFIDENCE IN THE CAR AT THIS
TIME, AS I DO NOT WANT MYSELF OR MY FAMILY (INCLUDING 1
YEAR OLD DAUGHTER) TO BE STRANDED IN THE MIDDLE OF
NOWHERE BECAUSE MY ALMOST-NEW CAR ENGINE FAILS AT LOW
MILEAGE FOR NO REASON. FOR REASONS OF PRIVACY I AM NOT

ATTACHING MY VIN NUMBER, BUT I CAN PROVIDE IT IF REQUIRED
FOR FOLLOW-UP. THE BUILD DATE OF THE VEHICLE WAS 7/2008. *TR

**Date Complaint Filed**: 05/03/2009
**Date of Incident**: 12/12/2008
**Component(s)**: ENGINE AND ENGINE COOLING
**NHTSA ID Number**: 10267601
**Consumer Location**: AKRON, OH
**SUMMARY**:
I PURCHASED A 2009 SUBARU IMPREZA WRX (BUILD DATE OF 07/08)
IN SEPTEMBER, 2008. ON DECEMBER 12, 2008 (W/ APPROX 3870 MILES
ON THE ODOMETER) DURING MY COMMUTE LEAVING WORK UPON
MERGING INTO TRAFFIC THE VEHICLE EXHIBITED A SUDDEN LOSS
OF POWER. THANKFULLY AT THIS TIME TRAFFIC WAS LIGHT AND
THERE WAS NO ACCIDENT. THE VEHICLE AT THIS TIME EXHIBITED A
RATHER PRONOUNCED CYCLIC KNOCKING SOUND AND HARSH
VIBRATION. I WAS ABLE TO LIMP THE VEHICLE TO THE HOME OF A
FAMILY MEMBER (VEHICLE AT THIS POINT HAD 3892 MILES ON THE
ODOMETER); SHORTLY THEREAFTER THE VEHICLE CEASED TO
FUNCTION ENTIRELY AND COULD NOT BE RE-STARTED.
THANKFULLY I WAS PROXIMAL TO THE HOME OF A FAMILY
MEMBER. IT COULD BE ENVISIONED THAT THIS PROBLEM MIGHT
LEAVE OTHERS STRANDED IN AN UNSAFE ENVIRONMENT
(ESPECIALLY FOR THOSE LIVING IN/NEAR THE SNOW-BELT, AS I DO).
THE PROBLEM WAS DIAGNOSED AS A SPUN ROTATING ASSEMBLY(#3
ROD) CAUSING ENGINE FAILURE, THE LONG BLOCK WAS REPLACED,
AND THE VEHICLE WAS RETURNED TO ME ON DECEMBER 19, 2008.
WHILE THE VEHICLE HAS NOT EXHIBITED ANY FURTHER PROBLEMS
THUS FAR, IN THE RECENT MONTHS THROUGH MY OWN RESEARCH I
HAVE BEEN MADE AWARE OF APPROXIMATELY 60 (AND COUNTING)
OTHER 09 WRX THAT EXHIBIT THIS SAME DEFECT IN THE US.
SIMILARLY I HAVE BEEN MADE AWARE OF 09 WRX EXHIBITING THIS
SAME DEFECT IN BOTH CANADA AND AUSTRALIA, SOME LEGACY
AND FORESTERS EXHIBITING THIS SAME DEFECT, AND THAT EVEN
SOME REPLACEMENT ENGINES HAVE FAILED DUE TO THIS SAME
DEFECT (SUBARU HAS REPLACED SOME DEFECTIVE ENGINES WITH
FURTHER DEFECTIVE ENGINES). WHILE THE MOST RECENT
PROBLEMS SEEM TO HAVE INITIATED ON VEHICLES BUILT IN 07/08, IT
SEEMS THAT THIS DEFECT OR ONE VERY SIMILAR ALSO OCCURRED
ON SELECT 08 SUBARU MODELS. FOR THE REASONS I HAVE

PREVIOUSLY MENTIONED (LOSS OF POWER IN TRAFFIC OR
COMPLETE ENGINE FAILURE WITH THE POTENTIAL TO LEAVE THE
OCCUPANTS IN AN UNSAFE ENVIRONMENT) I FEEL THIS IS A
LEGITIMATE SAFETY CONCERN AND HOPE THAT SOME RESOLUTION
CAN BE MADE IN THE NEAR FUTURE. *TR

**Date Complaint Filed**: 05/06/2009
**Date of Incident**: 04/05/2009
**Component(s)**: ENGINE AND ENGINE COOLING
**NHTSA ID Number**: 10267818
**Consumer Location**: BOULDER, CO
**SUMMARY**:
MY 09 WRX, PURCHASED IN OCTOBER, SPUN A BEARING ROD JUST
OVER A MONTH AGO (HAD 6001 MILES ON IT AT THE TIME). I LIVE AT
ALTITUDE (8200 FT) AND DRIVE A ROUGHLY PAVED MOUNTAIN
ROAD EACH DAY. THIS IS NOT GOOD ON MY TIRES, NOT ONE BIT.
MIKE SHAW SUBARU IN THORTON, COLORADO HAS FINALLY
GOTTEN AROUND TO FIXING THE CAR. TOOK THEM ONE MONTH,
AND I HAD A RENTAL CAR FOR ONE WEEK, BUT, THEY REPLACED
THE TURBO AND ENGINE. ONE MAJOR HOWEVER HERE. LET ME
QUOTE MY MIKE SHAW PAPERWORK- THAT I REFUSED TO SIGN-
"THIS REPAIR IS NOT COVERED BY SUBARU'S LIMITED WARRANTY
DUE TO THE ABUSIVE OR AGGRESSIVE DRIVING HABITS AND/OR
VEHICLE MODIFICATIONS." BECAUSE OF TIRE WEAR? REALLY? NOW,
MY WARRANTY IS SHOT FOR ANY FUTURE ENGINE WORK, THE
DEALERSHIP ITSELF TOLD ME. I REFUSED TO SIGN ANY OF THEIR
PAPERS, AND WILL BE AGGRESSIVELY PURSUING LITIGATION IF I DO
NOT GET THIS DECISION REVERSED OR AT LEAST HAVE SOMEONE
KNOWLEDGEABLE EXPLAIN TO ME HOW I 'ABUSED' MY CAR. I WENT
ABOVE AND BEYOND THE BREAK-IN PERIOD (2K MILES BEFORE IT
EVER HIT ANY SUBSTANTIAL, SUSTAINED RPM). THE VEHICLE
HISTORY REPORT WILL KILL ME WHEN/IF I TRY TO SELL THIS CAR. I
ALSO WARMED THE CAR UP FOR A FULL 10 MINUTES BEFORE EVEN
REMOTELY PUSHING THE CAR BETWEEN 2K AND 6K MILES. WHAT
THIS CAME DOWN TO WAS THEM TELLING ME, VERBATIM, THAT "9/10
OF THESE CARS WITH THIS ISSUE HAVE COME IN DUE TO DRIVER
ERROR". ARE YOU KIDDING ME? THIS WAS FROM THE SAME PEOPLE
THAT WANTED TWO PROOFS OF OIL CHANGE IN THE FIRST 5,970
MILES BEFORE THEY WOULD PROCEED WITH CHANGING MY ENGINE.
I PROVIDED ONE, AND THEY RELENTED, BUT THE SHEER ABSURDITY

IS THE ISSUE AT HAND HERE. I CALLED SOA AND AM STILL WAITING
FOR A RETURN CALL. PERHAPS I WILL ENDLESSLY HIT REDIAL IN AN
EFFORT TO REDEEM MY WARRANTY, OR PERHAPS I WILL DO MY
ABSOLUTE BEST SHEDDING LIGHT ON THIS DEFECTIVE 09 WRX ISSUE
VIA EVERY OTHER MEANS AVAILABLE. *TR

**Date Complaint Filed:** 04/08/2010
**Date of Incident:** 04/07/2010
**Component(s):** ENGINE AND ENGINE COOLING
**NHTSA ID Number:** 10324430
**Consumer Location:** SUSSEX, NJ
**SUMMARY**:
2009 SUBARU IMPREZA WRX WAGON HAS 5960 MILES WAS A NEW
VEHICLE PURCHASE IN OCTOBER 2009. VEHICLE NEW CAR
GUIDELINES WERE FOLLOWED AS WERE THE MAINTENANCE
PROCEDURES. THE VEHICLE ENGINE I FEEL HAS A MECHANICAL
DEFECT IN THE ENGINE. THE ENGINE HAS SPUN A BEARING BLOWN A
ROD AND DAMAGED THE CRANKSHAFT.

**Date Complaint Filed**: 08/10/2010
**Date of Incident**: 07/10/2010
**Component(s)**: POWER TRAIN
**NHTSA ID Number**: 10348399
**Consumer Location**: GREENFIELD, WI
**SUMMARY**:
MAIN ROTATING ASSEMBLYFAILED WHILE DRIVING DUE TO SUBARU
REDESIGNING THEIR BEARINGS AND NOT USING COPPER. CAR HAS
30,000 MILES ON ENGINE. BETWEEN ALL THE PISTON FAILURES AND
BEARING FAILURES SUBARU SHOULD OWN UP AND TAKE CARE OF
ITS LOYAL CUSTOMERS AS I DON'T KNOW IF I WILL EVER BUY ONE
AGAIN. *TR

**Date Complaint Filed**: 10/13/2010
**Date of Incident**: 09/26/2010
**Component(s)**: ENGINE AND ENGINE COOLING
**NHTSA ID Number**: 10360292
**Consumer Location**: WESLEY CHAPEL, FL
**SUMMARY**:
1. I WAS DRIVING THE CAR ON A ROAD TRIP TO NC WHEN THE ISSUE
AROSE. 2. THE FAILURE TO THE CAR WAS CRACKED RINGLANDS ON

THE # 2 AND 4 PISTONS. THIS CAUSED THE CAR TO PRODUCE A WHITE SMOKE CLOUD ON START UP. BEFORE I PURCHASED THIS CAR SUBARU ISSUED A STOP SALE ON ALL 2008 WRX'S. THE CAR WAS REPAIRED AT A LOCAL DEALERSHIP UNDER A GOODWILL REPAIR. TO WHICH I WAS RESPONSIBLE FOR PART OF THE COST. THIS REPAIR WAS CONDUCTED IN MAR 2010. SINCE THEN THE CAR HAS BEEN OPERATING VERY WELL UNTIL RECENTLY TO WHICH THE ENGINE HAS DEVELOPED A KNOCK. I HAD THE CAR TOWED TO THE DEALERSHIP TO DETERMINE WHAT THE ISSUE WAS. THE DEALERSHIP CONTACTED ME THE NEXT DAY TO INFORM ME THAT THE ROTATING ASSEMBLYON CYL #4 HAD FAILED. THIS IS THE SAME ISSUE THAT PROMPTED SUBARU TO PLACE A STOP SALE ON THE VEHICLES. DURING THE INITIAL STOP SALE THEY HAD A RANGE OF VIN'S THAT COULD HAVE BEEN AFFECTED, MINE WAS NOT IN THAT LIST. I THINK SUBARU HAD MIS-CALCULATED THE NUMBER OF CARS THAT WERE AFFECTED ON THIS STOP SALE. 3. MY CAR IS CURRENTLY AT THE DEALERSHIP AWAITING A RE-MANUFACTURED ENGINE, TO WHICH I HAVE TO DISAGREE WITH. I PURCHASED THIS CAR NEW WITH NO RE-MANUFACTURED ON IT FROM THE FACTORY. SO WHY CAN A CAR MAKER PLACE RE-MANUFACTURED PARTS IN A CAR FOR A REPAIR? *TR

**Date Complaint Filed:** 02/09/2011
**Date of Incident:** 03/20/2010
**Component(s):** ENGINE AND ENGINE COOLING
**NHTSA ID Number:** 10381348
**Consumer Location:** MATHER, CA
**SUMMARY**:
2009 IMPREZA WRX THERE WAS NO INDICATION THAT A FAILURE WAS GOING TO OCCUR BEFORE IT HAPPENED. I HAD DRIVEN THE CAR NORMALLY FOR ALMOST 4 MONTHS. THE ENGINE BEGAN TO MAKE A LOUD KNOCKING NOISE AROUND 2000 RPM, SOUNDING LIKE METAL HITTING METAL AS I PULLED UP TO A STOP SIGN. FORTUNATELY I HAD JUST ENTERED MY NEIGHBORHOOD SO I WAS ABLE TO GET HOME AND HAVE MY CAR TOWED. SUBARU ROAD SIDE ASSISTANCE TOWED THE CAR AND I WAS GIVEN A RENTAL FOR 20 DAYS. SUBARU DEALER SAID IT WAS A SPUN ROTATING ASSEMBLYAND ENGINE NEEDED TO BE REPLACED. EVEN THOUGH I REQUESTED A LONG BLOCK REPLACEMENT I ONLY GOT A SHORT BLOCK, SO THE TURBO IS THE SAME. SINCE THIS OCCURRED I HAVE

HAD NUMEROUS OTHER PROBLEMS, CLUTCH THROWOUT BEARING
REPLACEMENT, STARTER, AIR CONDITIONING PROBLEMS. THIS CAR
IS A LEMON BUT ITS IMPOSSIBLE TO CONVINCE SUBARU OF THAT
FACT. ENGINE BLOWN AT 3300 MILES. CLUTCH PROBLEM AT 7000
MILES. STARTER FAILURE AT 9600 MILES (2/2011). REPORTED TO SOA.
*TR

**Date Complaint Filed**: 09/01/2011
**Date of Incident**: 08/05/2010
**Component(s)**: ENGINE AND ENGINE COOLING
**NHTSA ID Number**: 10423716
**Consumer Location**: CLIFTON PARK, NY
**SUMMARY**:
ENGINE KNOCK SOUND WHILE TRAVELING ON HIGHWAY, PULLED
OFF NEXT EXIT AND CAR SHUT DOWN. NO CHECK ENGINE LIGHTS OR
OIL LIGHTS INDICATING AN ISSUE. UPON RESTART KNOCKING
SOUND WAS LOUDER AND HAD A METAL SOUND TO IT. I
IMMEDIATELY SHUT THE CAR OFF AND CALLED ROADSIDE
ASSISTANCE AND HAD THE CAR TOWED TO LOCAL DEALER. UPON
FIRST REVIEW DEALER IDENTIFIED IT AS "INTERNAL CONNECTING-
ROTATING ASSEMBLYFAILURE" WHICH CAUSED CATASTROPHIC
ENGINE DAMAGE. SUBARU OF AMERICA DENIED THE REPAIR DUE TO
THE ECM BEING MODIFIED, STATING "OUR ENGINEERS REVIEWED
YOUR FILE AND DEEMED IT TO BE CAUSED BY THE ECM
MODIFICATION". I HAVE FOUND NUMEROUS CASES OF THE EXACT
ISSUE ON THE INTERNET, AS WELL AS A MY DEALERSHIP TELLING
ME THERE IS A TSB FOR THIS FAILURE. SOA IS PROVIDING A "ONE
TIME GOOD FAITH REPAIR" BUT I AM RESPONSIBLE TO REPLACE THE
ECM. IN MY OPINION THIS ISSUE WHICH SOA IS AWARE OF AND
ACKNOWLEDGES WITH A TSB SHOULD BE A RECALL - THE ENGINE
FAILURE AT HIGHWAY SPEED HAS POTENTIAL TO CAUSE BODILY
HARM - LOSS OF POWER, ENGINE SEIZE RESULTING IN AN ACCIDENT.
I WAS LUCKY TO NOT BE INVOLVED IN ANY SORT OF ACCIDENT.
FURTHER I AM TOTALLY UNSURE OF HOW SOA CAN CLAIM THE
FAILURE WAS DUE TO ECM MODIFICATION WITHOUT EVER
PHYSICALLY SEEING OR HAVING THE MOTOR PULLED FROM THE
VEHICLE. THE ECM MODIFICATION IS AN EXCUSE TO NOT FULLY
COVER THE REPAIR.

**Date Complaint Filed**: 04/16/2012

**Date of Incident**: 04/13/2012
**Component(s)**: ENGINE AND ENGINE COOLING
**NHTSA ID Number**: 10455419
**Consumer Location**: WASCO, OR
**SUMMARY**:
CATASTROPHIC ENGINE FAILURE. APPARENTLY, A NOT UNCOMMON
PROBLEM (ENGINE BEARING). VEHICLE UNDER BOTH FACTORY AND
EXTENDED WARRANTY. SUBARU NORTH AMERICA IS TRYING TO
AVOID FIXING UNDER WARRANTY (AGAIN, IT SEEMS A NOT
UNCOMMON PROBLEM). SUBARU CLAIMS OIL LEAKED OUT, BUT OIL
PRESSURE LIGHT NEVER CAME ON. SUBARU IS NOT DEALING ON THE
UP AND UP. *JS

**Date Complaint Filed:** 09/25/2014
**Date of Incident:** 09/23/2014
**Component(s):** ENGINE
**NHTSA ID Number:** 10638895
**Consumer Location:** LOVELAND, OH
**SUMMARY**:
WHILE DRIVING ON I-74 BETWEEN CINCINNATI OH AND
INDIANAPOLIS IN I NOTICED THE DEVELOPMENT OF A ENGINE
KNOCK AT AROUND SHELBYVILLE IN. NO WARNING LIGHTS WERE
ILLUMINATED BUT I PULLED OVER AND INSPECTED THE ENGINE AND
COULD NOT FIND ANYTHING OBVIOUSLY WRONG SO I CONTINUED
ON MY TRIP. AFTER REACHING I-465 IN INDIANAPOLIS THE KNOCK
BEGAN TO GET PROGRESSIVELY WORSE. AT THE INTERSECTION OF I-
465 AND I-65 THE CAR WITHOUT WARNING ENGINE SHUTDOWN AND I
LOST ALL FUNCTIONALITY (POWER STEERING, TURN SIGNALS, ETC).
AT THE TIME OF POWER LOSS I WAS TRAVELING AT
APPROXIMATELY 65 MPH DURING RUSH HOUR IN THE FAST LANE.
LUCKILY THE DRIVER BEHIND ME WAS FOLLOWING AT A SAFE
DISTANCE AND I WAS ABLE TO AVOID A COLLISION AND SAFELY
GET ONTO THE LEFT HAND SHOULDER. I WAS THEN ABLE TO GET
THE CAR RESTARTED AND ATTEMPTED TO GET OFF OF I-465 FOR MY
SAFETY. HOWEVER, AT THE NEXT EXIT THE ENGINE ONCE AGAIN
SHUTDOWN. I WAS ONCE AGAIN ABLE TO SAFELY GET TO THE
SHOULDER BUT WAS UNABLE TO GET THE CAR STARTED AGAIN.
BASED ON FEEDBACK FROM THE DEALER AND MY EXPERIENCE AS A
MECHANICAL ENGINEER I BELIEVE THAT THE CAUSE OF THIS
CATASTROPHIC FAILURE WAS A FAILED BEARING WITHIN THE

ENGINE. THE FACT THAT THIS POTENTIALLY FATAL FAILURE COULD
OCCUR WITHOUT WARNING ON A CAR THAT IS LESS THAN 6 YEARS
OLD WITH LESS THAN 100K MILES IS VERY CONCERNING TO ME. IF
THE OTHER DRIVERS ON THE INTERSTATE HAD NOT BEEN PAYING AS
CLOSE ATTENTION AS THEY WERE I BELIEVE THAT THIS CRASH
COULD HAVE BEEN FATAL TO MYSELF AND POTENTIALLY OTHERS.
MY CAR HAS HAD ALL SCHEDULED MAINTENANCE AND OIL
CHANGES AND IS WELL CARED FOR SO THE EARLY CATASTROPHIC
FAILURE OF THE ENGINE CANNOT BE DUE TO NEGLECT. SUBARU HAS
ESTIMATED THE COST OF THE REPAIR AT $11K FOR THE
REPLACEMENT OF THE ENTIRE ENGINE AND IS CURRENTLY NOT
OFFERING TO COVER ANY OF THE COSTS EVEN THOUGH THE
FAILURE WAS CAUSED BY A DEFECTIVE ENGINE AND NOT DUE TO
LACK OF MAINTENANCE. *TR

67.     Numerous other Class Members have also complained on the internet

and online forums about the Rotating Assembly Defect within the Class Vehicles.[9]

68.     Defendants have failed to disclose the Rotating Assemble Defect to

drivers or potential customers. Likewise, Subaru has never instructed its

dealerships to disclose the defect.

69.     As a result of Subaru's inaction and silence, consumers were unaware

they were buying or leasing defective vehicles, and many drivers do not discover

---

[9] http://www.iwsti.com/forums/2015-sti-discussion/282433-another-2015-sti-spun-
rod-bearing.html (last visited October 6, 2017);
https://forums.nasioc.com/forums/showthread.php?t=2719361 (last visited October
6, 2017); http://www.iwsti.com/forums/warranty-service-issues/269969-soa-not-
covering-2013-sti-rod-bearing.html (last visited October 6, 2017);
https://forums.nasioc.com/forums/showthread.php?t=2689606 (last visited October
6, 2017); http://www.wrxtuners.com/forums/f103/2014-wrx-spun-bearing-59k-
76161/ (last visited October 6, 2017);
https://www.reddit.com/r/subaru/comments/23rndq/i_spun_a_rod_bearing_is_this_

the Rotating Assembly Defect until after their lives have been jeopardized or various components in their vehicles have been damaged.

70.     As Subaru knows, a reasonable person would consider the Rotating Assembly Defect material and would not purchase or lease a vehicle equipped with the defect if the defect disclosed in advance, or would pay substantially less for the vehicle. Yet the defect was not known to or reasonably discoverable by Plaintiff and proposed class members before purchase or lease.

71.     As of this date, Subaru continues to conceal the Rotating Assembly Defect from consumers.

## VII. CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action on his own behalf, and on behalf of the nationwide class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who bought or leased a Class Vehicle (the "Nationwide Class").

73.     Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiff seeks to represent the following state class only in the event that the Court declines to certify the

---

a_reasonable_quote/ (last visited October 6, 2017); https://forums.nasioc.com/forums/showthread.php?t=2794958 (last visited October 6, 2017); https://forums.nasioc.com/forums/showthread.php?t=2401576 (last visited October 6, 2017).

Nationwide Class:

**California Class:**

All persons in California who bought or leased a Class Vehicle.

74.     Excluded from the Nationwide Class and California Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Nationwide Class or the California Class definitions based on discovery and further investigation.

75.     Numerosity: Upon information and belief, both of the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that hundreds of thousands of Class Vehicles have been sold and leased both nationwide and in California.

76.     Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to whether:

        a.      The Class Vehicles were sold with a defect;

b.    The defect with which the Class Vehicles were sold was a spun connecting rod bearing, metal shavings in the oil, and catastrophic engine failure;

c.    Subaru knew or should have known about the defect;

d.    Although Subaru knew or should have known about the defect, it failed to disclose the problem and its consequences to its customers;

e.    A reasonable consumer would consider the defect or its consequences to be material information;

f.    Subaru should be required to disclose the existence of the defect; and

g.    Defendants' conduct violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq*., and the other statutes asserted herein.

77.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of both Classes since Plaintiff purchased or leased a defective Class Vehicle, as did each member of the Classes. Furthermore, Plaintiff and all members of both Classes sustained economic injuries arising out of Defendants' wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class members.

78.     Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Classes that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

79.     Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of both Classes. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them. Even if the members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification

numbers, warranty claims, registration records, and database of complaints.

80.     Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VIII. VIOLATIONS ALLEGED

### COUNT I
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56:8-1, *et seq.*)
### (On Behalf of the Nationwide Class)

81.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth and length herein.

82.     The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.S.A. 56:8-2.

83.     Plaintiff and Class members are consumers who purchased and leased Class Vehicles.

84.     In the course of Defendants' business, they knowingly concealed, suppressed, and omitted the fact that the Class Vehicles are defective, with the intent that Plaintiff and the proposed class rely upon that concealment, suppression,

and omission when purchasing or leasing Class Vehicles. The existence of the engine defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to his or her safety, may lead to thousands of dollars in repair expenses, negatively affects Class Vehicles' emissions, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

85.     Defendants have engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive. Further, Subaru's acts and practices described herein offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Subaru fraudulently concealed the defective nature of the Class Vehicles from consumers.

86.     Subaru's actions as set forth above occurred in the conduct of trade or commerce.

87.     Defendants' conduct caused Plaintiff and Class members to suffer an

ascertainable loss. Plaintiff and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class members have also incurred and will continue to incur costs for engine repair and, in some instances, incidental charges such as vehicle towing and dealership diagnostic fees.

88.    Plaintiff's and other class members' damages are the direct and foreseeable result of Defendants' unlawful conduct. Had the Rotating Assembly Defect in the Class vehicles been disclosed, consumers would not have purchased or would have paid less for the Class Vehicles and would have been spared the subsequent expenses.

89.    Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

90.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth and length herein.

91.    Defendants provided all purchasers and lessees of the Class Vehicles with two express warranties. First, the Class Vehicles have a 3 year/36,000 mile

basic bumper-to-bumper warranty. Second, the Class Vehicles have a 5 year/60,000 mile powertrain warranty. The powertrain warranty includes the engine, engine block and all internal parts, the cylinder heads and valve trains, and oil seals and gaskets.

92.     Both of these warranties became part of the basis of the bargain. Accordingly, Defendants' warranties are express warranties under state law.

93.     The parts affected by the defect, including the connecting rod bearings and engines, were manufactured and distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

94.     Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

95.     Plaintiff notified Defendants of the breach within a reasonable time, and/or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants also knew of the defect and yet chose to conceal it and to fail to comply with their warranty obligations.

96.     As a direct and proximate cause of Defendants' breach, Plaintiff and

the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class members have also incurred and will continue to incur costs for engine repair and incidental expenses.

97.     Defendants' attempt to disclaim or limit these express warranties *vis-à-vis* consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

98.     The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and Class members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Subaru and the Class members, and Subaru knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

99.     Plaintiff and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

100.    Plaintiff and the other proposed class members are entitled to legal

and equitable relief against Defendants, including damages, consequential

damages, specific performance, attorney fees, costs of suit, and other relief as

appropriate.

**COUNT III**
**BREACH OF THE IMPLIED**
**WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the California Class)**

101.   Plaintiff incorporates by reference each preceding and succeeding

paragraph as though fully set forth and length herein.

102.   Defendants are "merchants" as defined under the Uniform

Commercial Code ("UCC").

103.   The Class Vehicles are "goods" as defined under the UCC.

104.   With the sale and lease of each Class Vehicle, Defendants impliedly

warranted that the Class Vehicles were of a merchantable quality.

105.   Class Vehicles are not of merchantable quality due to the engine

defect, which poses an unreasonable risk to driver safety, and potentially leads to

thousands of dollars in repair expenses and incidental charges, as well as

inconvenient maintenance.

106.   Defendants' attempt to limit the duration of the applicable warranty

period is unconscionable. Among other things, Plaintiff and members of the Class

had no meaningful choice in determining these time limitations, the terms of which

unreasonably favored Defendants. A gross disparity in bargaining power existed between Subaru and Class members, and Subaru knew that the Class Vehicles were defective at the time of sale and would fail well before their useful lives, yet chose to conceal that information, depriving Plaintiff and Class members of the ability to make an informed decision with respect to their purchase or lease decision.

107.   As a direct and proximate cause of Subaru's breach of implied warranty, Plaintiff and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class members have also incurred and will continue to incur costs for oil and oil consumption tests.

108.   Plaintiff and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

**COUNT IV**
**BREACH OF THE DUTY OF GOOD FAITH**
**AND FAIR DEALING**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the California Class)**

109.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

110.   Every contract in New Jersey and California contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

111.   Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiff and Class members of the defect in the Class Vehicles, and failing to fully and properly repair this defect.

112.   Defendants acted in bad faith and/or with a malicious motive to deny Plaintiff and the Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT V
### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE §§ 1750, *et seq.*)
### (On Behalf of the California Class)

113.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

114.   Plaintiff brings this claim on behalf of himself and the members of the California Class against Defendants.

115.   Defendants violated the Consumers Legal Remedies Act (CLRA), California Civil Code sections 1770(a)(5), (7), (9), (14), and (16), by engaging in unfair methods of competition and unfair and deceptive acts and practices in

connection with transactions—namely, the sale of Class Vehicles to Plaintiff and the proposed California Class—that were intended to, and did, result in the sale and lease of goods to consumers.

116.   In connection with the sale of Class Vehicles to Plaintiff and California Class members, Defendants knowingly concealed and failed to disclose the fact that the Class Vehicles are defective, with the intent that Plaintiff and the proposed class rely upon that concealment, suppression, or omission when purchasing or leasing Class Vehicles. The existence of the engine defect is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair and incidental expenses, requires inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

117.   Following Plaintiff's and proposed class members' purchase and lease of Class Vehicles, Defendants have continued to conceal and fail to disclose the defect.

118.   As a direct and proximate result of Defendants' conduct, Plaintiff and California Class members have been harmed. Plaintiff and the other California Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and California Class

members have also incurred and will continue to incur costs for additional engine

repair and incidental expenses. Meanwhile, Defendants have sold more Class

Vehicles than they otherwise could have and charged inflated prices for Class

Vehicles, thereby unjustly enriching themselves.

119.   On or about September 6, 2017, Plaintiff, on behalf of himself and

California Class members notified Subaru in writing of the CLRA violations and

requested that Subaru cure the violations. As of the date of this filing, Subaru has

failed to provide any written response to Plaintiff's pre-suit CLRA notification.

120.   Pursuant to California Civil Code § 1780, Plaintiff seeks all relief

available under the CLRA, including an order requiring Defendants to adequately

disclose and repair the defect, as well attorney fees and costs.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA BUSINESS AND**
**PROFESSIONS CODE (CAL. BUS. & PROF. CODE § 17200)**
**(On Behalf of the California Class)**

121.   Plaintiff incorporates by reference each preceding and succeeding

paragraph as though fully set forth at length herein.

122.   Plaintiff brings this claim on behalf of himself and on behalf of the

members of the California Class against all Defendants.

123.   Defendants' acts and practices, as alleged in this complaint, constitute

unlawful, unfair, and fraudulent business practices, in violation of the Unfair

Competition Law, Cal. Bus & Prof. Code §§ 17200, *et seq.*

124.   Defendants' acts and practices constitute unlawful business practices, as discussed elsewhere in this Complaint, in that they violate the Magnuson-Moss Warranty Act, California's Consumers Legal Remedies Act, and California's Song-Beverly Consumer Warranty Act, and breach Subaru's warranties.

125.   Defendants' acts and practices constitute unfair practices in that (i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate utility of Defendants' conduct is outweighed by the harm to consumers; (iii) the injury is not one that consumers reasonably could have avoided; and/or (iv) the conduct runs afoul of the public policies underlying the Magnuson-Moss Warranty Act, California's Consumers Legal Remedies Act, and California's Song-Beverly Consumer Warranty Act, which seek to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace, and thus provide a sufficient predicate for Plaintiff's claims for unfair business practices.

126.   Defendants' acts and practices constitute fraudulent practices in that they are likely to deceive a reasonable consumer, who would not have purchased a Class Vehicle had Subaru had adequately disclosed the defect and its ramifications.

127.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff and the proposed California Class have

suffered injury in fact and lost money or property, in that they bought or leased
Class Vehicles they otherwise would not have, overpaid for their vehicles, did not
receive the benefit of their bargain, and their Class Vehicles suffered a diminution
in value. Plaintiff and California Class members have also incurred and will
continue to incur costs for engine repair or replacement and incidental expenses.
Meanwhile, Defendants have sold more Class Vehicles than they otherwise could
have and charged inflated prices for Class Vehicles, unjustly enriching themselves
thereby.

128.   Plaintiff and the proposed California Class are entitled to equitable
relief, including restitutionary disgorgement of all profits accruing to Defendants
because of their deceptive practices and an order requiring Subaru to adequately
disclose and repair the defect.

**<u>COUNT VII</u>**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT**
**FOR BREACH OF EXPRESS WARRANTIES**
**(CAL. CIV. CODE §§ 1791.2 & 1793.2(D))**
**(On Behalf of the California Class)**

129.   Plaintiff incorporates by reference all allegations of the preceding
paragraphs as though fully set forth herein.

130.   Plaintiff brings this claim on behalf of himself and on behalf of the
members of the California Class against all Defendants.

131.   Plaintiff and the other California Class members who purchased or

leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

132.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

133.   Subaru is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

134.   Subaru made express warranties to Plaintiff and the other California Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

135.   Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

136.   Defendants did not promptly replace or buy back the vehicles of Plaintiff and proposed California Class Members.

137.   As a direct and proximate result of Subaru's breach of its express warranties, Plaintiff and the other California Class members received goods whose condition substantially impairs their value to Plaintiff and the other Class members. Plaintiff and the other Class members have been damaged as a result of, *inter alia,* the diminished value of Subaru's products, the products'

malfunctioning, and actual and potential increased maintenance and repair or replacement costs.

138.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

139.   Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other California Class members are entitled to costs and attorney fees.

## COUNT VIII
### THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY VIOLATIONS OF CALIFORNIA CIVIL CODE §§ 1792, 1791.1, *et seq.* (On Behalf of the California Class)

140.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

141.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Class against all Defendants.

142.   Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

143.   Subaru is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

144.   Subaru impliedly warranted to Plaintiff and the California Class that

Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

145.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

146.   Class Vehicles would not pass without objection in the automotive trade because the defect results in a spun connecting rod bearing, metal shavings in the oil, and catastrophic engine failure, posing an unreasonable risk to driver safety, and potentially leading to thousands of dollars in repair or replacement expenses, and expensive and inconvenient maintenance requirements.

147.   Because the engine defect poses an unreasonable risk to driver safety and materially reduces the reliability and dependability of the vehicles, the Class Vehicles are not fit for ordinary purposes for which such goods are used.

148.   Class Vehicles are not adequately labeled because the labeling fails to disclose the engine defect and does not advise proposed California Class members

of the defect or to take extra care to monitor their vehicle's oil levels as a result.

149.   The engine defect deprived Plaintiff and the proposed California Class of the benefit of their bargain and have caused Class Vehicles to be worth less than what Plaintiff and other proposed California Class members paid.

150.   As a direct and proximate result of Subaru's breach of its duties, proposed California Class members received goods whose condition substantially impairs their value. Plaintiff and the proposed California Class have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, and actual and potential increased maintenance and repair costs.

151.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and proposed California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles, and are also entitled to their attorney fees and costs.

## COUNT IX
## BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT
### (15. U.S.C. §§ 2301, *et seq.*)
### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

152.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

153.   Plaintiff and the Class are "consumers" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

154.    Defendant is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

155.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

156.    Defendant provided Plaintiff and the Nationwide Class with one or more express warranties which are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

157.    Defendant breached the express warranties by:

   a.  Providing a basic warranty of 3 years/36,000 miles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

   b.  Providing a powertrain warranty of 5 years/60,000 miles, thereby warranting to repair or replace any part defective in material or workmanship in the powertrain components at no cost to the owner or lessee;

   c.  Selling and leasing Class Vehicles with a latent defect that results in a spun connecting rod bearing, metal shavings in the oil, and catastrophic engine failure; and

   d.  Refusing and/or failing to honor the express warranties by

repairing or replacing, free of charge, the engine or any of its

component parts in order to remedy the defect resulting from spun

connecting rod bearings and/or metal shavings in the oil.

158.   Plaintiff and the other Class Members relied on the existence and

length of the express warranties in deciding whether to purchase or lease the Class

Vehicles.

159.   Defendant's breach of the express warranties has deprived the

Plaintiff and the other Class Members of the benefit of their bargain.

160.   The amount in controversy of each Plaintiff's individual claims meets

or exceeds the sum or value of $25.00. In addition, the amount in controversy

meets or exceeds the sum or value of $50,000 (exclusive of interests and costs)

computed on the basis of all claims to be determined in this suit.

161.   Defendants have been afforded a reasonable opportunity to cure their

breach of written warranties and/or Plaintiff and the other Class Members were not

required to do so because affording Defendant a reasonable opportunity to cure its

breach of written warranties would have been futile. Defendants were also on

notice of the alleged defect from the complaints and service requests they received

from Class Members, as well as from their own warranty claims, customer

complaint data, and/or parts sales data.

162.   As a direct and proximate cause of Defendants' breach of the written

warranties, Plaintiff and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## IX. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the putative Class he seeks to represent, respectfully requests that this Court:

A.      determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.      appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

C.      award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled;

D.      award pre-judgment and post-judgment interest on such monetary relief;

E.      grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall,

and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class members with appropriate curative notice regarding the existence and cause of the design defect;

F.     award reasonable attorney's fees and costs; and

G.     grant such further relief that this Court deems appropriate.

## X. JURY DEMAND

Plaintiff, on behalf of himself and the putative Class, demand a trial by jury on all issues so triable.

Dated: October 12, 2017          Respectfully submitted,

                    By:     /s/ Matthew D. Schelkopf
                            Joseph G. Sauder
                            Matthew D. Schelkopf
                            Joseph B. Kenney
                            MCCUNE WRIGHT AREVALO LLP
                            555 Lancaster Avenue
                            Berwyn, Pennsylvania 19312
                            Telephone: (610) 200-0581
                            jgs@mccunewright.com
                            mds@mccunewright.com
                            jbk@mccunewright.com

                            Richard D. McCune
                            David C. Wright
                            MCCUNE WRIGHT AREVALO LLP
                            3281 Guasti Road, Suite 100
                            Ontario, California 91761
                            Telephone: (909) 557-1250

Facsimile: (909) 557-1275
rdm@mccunewright.com
dcw@mccunewright.com

Bruce Greenberg
**LITE DEPALMA GREENBERG, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Counsel for Plaintiff and the putative Class*